May it please the Court, this is the second case, and as the Court, I'm sure, is aware Oh, and I will reserve as well three minutes for rebuttal. Thank you. As the Court is aware, what happened in this case is after the judge denied our motion to vacate and we were in the process of filing our appeal, Mr. Grant went ahead and filed a second arbitration saying that the motion to vacate and the appeal of the same was an abusive process, was frivolous, was malicious and so forth, and he was seeking separate damages in connection with that. Judge, we tried to enjoin that action as well as we, the other side, filed a motion to compel arbitration of that action saying that all of those issues should be decided by the arbitrator. As to the first issue, the decision of the lower court should be reversed with respect to the independent claims of Mr. Grant. These are independent of the contract. The contract between the parties surrounds the issue of the account, and it is very clear in stating that all account-related, and I'm paraphrasing. It's very clear. What's very clear? It's very clear in stating. What is very clear? I'm sorry. The arbitration provision and the scope of the arbitration provision is clear. And in your view, it's clear in saying what? It is clear in that it relates to account-related disputes. I'm reading the language. The undersigned agrees, and by accepting, opening, and maintaining an account, Morgan Keegan agrees that all controversies between the undersigned and Morgan Keegan agree to be determined by arbitration. That's the clause that you think is clear. I do. And I'll explain why. I think it's clear, too. And I'll explain why. The contract, looking at, again, we have to apply traditional contract principles to the agreement, the contract, when you look at the totality of the agreement, specifies account-related activities. Where does it say that? I'm sorry, Your Honor? Where does it say that? Well, what I'm referring to is the previous point, the point that you just read, which may arise from any account whatsoever. Or any cause whatsoever. That's right. Or cause whatsoever. And in the provision, in various headings throughout the contract, not just in the arbitration provision, but throughout the contract, it refers to the disputes that might arise with respect to discretionary trades, with respect to examining statements, order-taking, deliveries, commission fees, and the like. All of that conduct relates to the account. So as I read this provision, what this is saying is, is that any dispute relating to, excuse me, arising under the account is subject to arbitration. And where it says, or for any cause whatsoever, that refers to causes of action. So whether it be a bruce fiduciary duty claim, a fraud claim, a negligence claim, or whatever, towards that go to the heart of the underlying dispute. Okay. I don't read it that way. What's your authority for that? That it refers to causes of action? Well, my authority for that is applying common law principles of contract destruction. Well, it seems to me that hurts you, because your client drafted the agreement. So any ambiguity is resolved against your client under contract law. And that's correct, Your Honor. However, I don't view that as ambiguous. Well, I do. You could have said causes of action. We could have said causes of action. We could have said. And if the causes of action had to relate to the contract, you would have said and, but you said or. So or is much broader. So why isn't or any cause whatsoever? I mean, that's the. Let me ask you this. Have you ever seen a reported decision from any court that had broader language in an arbitration agreement than this one? Indeed, we have, Your Honor. In fact, we cite them in our case. And it's broader than this? Yes. And I would refer the court, if I may, to the Buckhorn v. St. Jude Heritage case, as well as the Merritt v. Riders Guild case. Both of those provisions were even broader than this, because it didn't have the, by analogy, the account-related language. And. Well, I confess I don't really see any account-related language that restricts this clause. It says any cause whatsoever between the parties. Bingo. You've got a cause between the parties, and it is in some fashion, of course, related to this dispute. I mean, it's not as though you shot his dog and he's asking for arbitration of that. But it's not related to the account. What it is, and let's look at it a slightly different way, Your Honor. In this case, the other side, Mr. Grant, filed a motion for sanctions in connection with the record excerpts. Now, he didn't take that claim to arbitration. Instead, he filed that claim for sanctions for an abusive process to this Court. Why didn't he? Because he recognizes that there's a distinction between the contract as it is drafted versus the independent tort for which he sought a remedy. The Court denied that request, by the way. So we have the same situation here. He is seeking a, again, assuming that it's a good claim. We don't know that yet because it hasn't been heard. But that claim is an independent tort. It is independent of the account and the relationship. What it refers to is not the broker-customer relationship. That refers to a litigation versus litigant relationship. And that's not part of the contract. The contract refers to the contract. You know, if you wanted to draft a narrow arbitration clause, you could have drafted one. And it seems to me that you're now just being hoisted by your own petard. I mean, you acted very broadly. It's very broad. There it is. And that's what you got. Well, but, Your Honor, does it, again, just applying common sense, common law principles to it, would it then make sense? Because according to that reading, to Mr. Grant's reading of the agreement, what that would say is that, indeed, the motion to vacate should have been filed with a subsequent arbitration proceeding, that instead of going to court, what should have happened is we should have said, hey, we need to compel that claim to arbitration because it's for any cause whatsoever, as well as any sanctions associated with that, as well as any issues relating to the record absurd. Yeah, but, you know, it says they're for any cause whatsoever, you know. And your client drafted the layman. That's correct, Your Honor. But what else is there? What else is there is that, is that that – well, the second issue before the court relates to the injunction. And that is we have an arbitration in the second Grant case, which – where the discovery is scheduled to commence in January. And you get the injunction only if we were to construe the clause your way, right? No, actually, Your Honor. Okay. This is a separate issue. Okay. And, in fact, the – So if we conclude that the arbitration that's now about to go forward is – comes within this clause, we nonetheless can adjoin it? No. What you would do is – is render a stay as to that arbitration until the court makes a decision in the first Grant case. Because, presumably, if the court – Then you might get a decision simultaneously on both of these. And if that happens before January, Your Honor, then there's no issue, because that's when discovery might begin in the other case. Okay. That's what it relates to. Okay. And Judge Otero denied that – that request as moot. And that was error. He should have addressed that issue as well, because at this point, the parties could be – you know, we've reached an agreement to stay the discovery until January. But barring that, we would be incurring expense and so forth and so on. Okay. Good. But I do want to go back to – and I understand – I've heard loud and clear the comments of the Court. But going back to the contract, just if I may, and that is, again, applying the common sense of, okay, when Mr. Grant walked into the Morgan Keegan office and signed that agreement, and when – whoever was on the other side of that discussion, they were entering into a broker-client contract. It was for those purposes. It was not for – well, gee, if you slip and fall in our lobby, you then have to be compelled into arbitration. Imagine if Mr. Grant walked out that day, slipped and fell in the lobby and suffered some injury, and filed a lawsuit, and we tried to compel that arbitration and said, here, you just signed this and said, for any cause whatsoever. No. What he would say is, when I walked into the office, I was entering into an agreement to have you all enter into a broker-customer relationship. It wasn't to forego my rights forever and ever and ever with respect to being able to litigate. Now, that same principle applies here. If this was an account-related, broker-customer-related issue, then it would absolutely be proper before the – Well, it is. It arose out of the account and the arbitration that flowed from the account. It's not like he was walking outside and tripped over a dog that one of the brokers let loose or something. I mean, this is definitely related to the account because it arose out of an arbitration agreement that was related to the account. We need to leave canines out of it. Let's say he tripped over a cat. In any way. How about a skunk? Okay. A skunk. Your Honor. But your analogy about him, you know, having a personal injury lawsuit after he leaves your building is a little bit different than something that arises in an arbitration proceeding that you compelled him to participate in because you're the one that drafted the arbitration clause and your industry wants the arbitration clause and he had no ability to negotiate those. They're totally nonnegotiable. They are nonnegotiable. Let's go with that, Your Honor. Okay. Let's go with it. Okay. But this arbitration clause, and this is why I mentioned the SEC previously, this arbitration clause is blessed by the SEC. That was extremely important to the Supreme Court in the McMahon, the Rodriguez, Dacias, as well as the Interstate Johnson Lane Gilmer case. The fact that the SEC has ultimate oversight over FINRA and these arbitration proceedings. They bless the rules and so forth and so on. What they don't do, of course, is they're not involved in selecting arbitrators and they don't know what happens in the arbitrations themselves. But they approve these agreements. And so when there is a discussion about, well, gee, you know, we forced them into this. It's unfair. It's biased toward the industry. Indeed, those arguments have been rejected by the Supreme Court because it's deemed to be fair to investors because of the fact we have the SEC oversight. So going back to your question, which is, well, gee, isn't the tripping over some animal different than what we have here? Not really. Because it's an independent tort. This is, again, assuming the facts as alleged are true. But it's an independent tort that arises out of an arbitration agreement that you required him to sign. Well, okay. So if he was walking out of the arbitration and tripped over some animal, would that be then compelled to arbitration? I think not. That would be an independent action. What if it happened in your building? Assuming we own the building, okay. Again, I would say that is an independent action. That is an entirely independent matter that should go to court. We argue you have slippery floors in the building. And they should be able to sue for that. That's right. And they have a right of relief in the court system for that. You know, I understand the argument, and there's a certain amount of logic to it. I get this. That somehow should be related to the dispute arising out of the account. And you could have written words in there like arising out of or arising under. Those are very common words. In fact, those are the words in the Cape Flattery case you sent us this morning or yesterday that seems to me entirely irrelevant because those words are not here. Instead, you wrote dispute that may arise for any cause whatsoever between the parties. I mean, I don't even know that that necessarily excludes a fight between Mr. Grant and Morgan Keegan over a trip and fall in the lobby of the building if Morgan Keegan owns it. Well, Your Honor, that's a great point if that's all the clause said. But what the clause says is which may arise from any account. Yeah. And then the next word is or. Or any cause whatsoever. Or for any cause. For any cause whatsoever. There you go. If the word or weren't there, you might be right. But the word or is there. The word or is there. But does it make, I guess, you know, again, applying traditional contract principles,  I mean, you wrote the language. I don't disagree with that. Yeah. So? I don't disagree with it. But, again, looking at the overall contract, which everything in the contract, everything refers to account-related activity. Nothing refers to anything about, gee, what happens if you sue us, either side sues the other, and somebody files a motion to vacate and there's subsequent claims and so forth. I understand that the slip and fall in the lobby is really out of the outer boundaries. But this, of course, is not such a case. This is not a slip and fall, but it is an independent tort. It's independent of the account-related activity. That's why the arbitration itself, that's why the dispute over the account. But it arises from any account. Correct. Yeah. So. If he didn't have an account. Then we wouldn't be here. We wouldn't have the claim, yeah. That's right. That's right. Respectfully, Your Honor, we request that both decisions of the lower court be reversed. Thank you. Okay. Thank you. In other words, I'm not going to strain the Court's credulity by arguing for analogies that are plainly unanalogous. As Judge Otero found, which is simply indisputable, this second arbitration arises directly from Morton Keegan's failure to abide by the arbitrator's order in Grant I. If they had simply paid it, there would be no Grant II. Judge Otero finds the two are inextricably related, and without Grant I, there would be no Grant II. As counsel said, they agreed to abide by the Venmo rules, which means including abiding by the decisions of arbitrators. And once they lost Grant I before Judge Otero and district court, that triggered the obligation to pay. And they didn't do it. So it just constrains any credulity to stand up here and argue that there's no relationship between Grant II and the account, or it doesn't arise out of it. Now, this is a somewhat different question from arbitrability. I can get to that. And this question is not in front of us. I understand all those things. Yes. Why do they have an obligation to pay after they've got a district court order, but it's still on appeal to us? I mean, that's what you just said, correct? Yes. Why does the obligation to pay come then when the appeal is still pending in Grant I? Well, we actually, when they didn't pay, we went to FINRA and wrote FINRA a letter and said they haven't paid. And FINRA came back and said, well, as long as they're appealing at district court level, they don't have to pay. Yes. So that's my question. I understand. I don't know why FINRA said that, but once they lost district court, they had to pay and they didn't pay. And they still have paid nothing. No, I'm not. No, I may be your – well, it's not in front of me, but I have to say I'm a little mystified why they have to pay when the matter is still on appeal. Well, the answer, as I understand it, is that only lasts so long as it's on appeal to district court. Those cases rarely are appealed to a Federal court of appeals. In addition, counsel mentioned asking this Court to issue a stay. Well, counsel never asked for a stay in the district court, nor could he have. Respectfully, a court can stay its own proceedings. A court enjoins the actions of an independent agency such as FINRA. So there was no stay requested before Judge Otero, and nor could one be issued now. What happened here is Judge Otero looked, as he was supposed to, at two questions, and those were very simple. One is, is there a legal binding agreement to arbitrate between the parties? There was no dispute as to that. The second question is, is this particular dispute within the scope of that legally binding arbitration agreement? Once he answered that in the affirmative, he could do no more than compel the arbitration. He was now required to go through the issues and make findings of fact regarding a preliminary injunction, which he did not do, and there was no request for a stay. Now, just in brief, in closing, I'd like to note that the original arbitration in Grant 1 was commenced over four years ago. The award was entered on September 11th of 2009. That's three years ago. One of the advantages of arbitration is supposed to be expediency and finality. As Judge Rakoff, the Senator of the District of New York, wrote in Goldman Sachs v. The Official Unsecured Creditors, I give you the cite for this, 758, FedSupp 2nd, 222, and I quote, While the arbitration is touted as a quick and cheap alternative to litigation, experience suggests it could be slow and expensive. And this has been, frankly, worse than that. This has been a disaster. And I think what it shows is Morgan Keegan uses this arbitration process they basically compel customers to sign up for as both a sword and a shield. When they win, there are not that many customers now having suffered a significant monetary loss, have the resource to appeal the district court, the loan to appeal to this court, and it's something that can take years. Yet when they lose, they do the exact reverse, and they deny the customer all the benefits of the arbitration process. And that's what they've done. And I think that's outrageous. And I ask the Court to consider the purpose of arbitration and fulfill the purposes of the Federal Arbitration Act and finally give Mr. Grant finality. And I ask the Court uphold the very well-reasoned decision of Judge Otero and rule with dispatch. Thank you. Yes, Your Honor. Mr. Crowe, I wanted to ask you about the same question I asked Mr. Weiss about the language or for any cause whatsoever or whatever. Yes. That seems to me extraordinarily broad compared to other arbitration agreements that I've read. Well, I agree, and I believe that they intended it to be so because I was saying they want to put the customer in a position of having to arbitrate all these cases. And as you correctly pointed out, this is their language. It's construed against them. As Judge Otero particularly points out, to facilitate the purposes of the Federal Arbitration Act also requires that arbitration clauses be construed in favor of arbitration. It is broad, but they can't, I think, now stand before you and say, well, we made a drafting error. We drafted an overly broad language. Therefore, our language is invalid. I mean, that makes — that's to give them the benefit of trying to, you know, deprive Mr. Grant of any rights at all. And so they can, you know, basically play this game of obstructionism with him, you know, on and on. So I don't think that matters. I think Judge Otero's ruling is thoroughly correct. This is a very broad arbitration clause. They drafted it, and this is squirreling within it, because without Grant I, there would be no Grant II. And if there's one other matter I would like to see if the Court would like to hear an argument on. I did file a motion to strike in this matter. The Commissioner granted part of it, as the Morgan Keegan's excerpts of record are laden with materials that are expressly prohibited under Federal rule of appellate procedure 30A2. And this is local rule 30-1.5. It is replete with memoranda of law. In a case like this, there's really only one issue, which is the scope of the arbitration clause. How is it that we have a 526-page excerpt of record? It wastes our time. It wastes your time. It multiplies the cost of litigation for everybody except Morgan Keegan, who are getting paid by the hour. If this Court wants those rules to mean anything, I ask that the Court enforce them and grant the motion to strike. And if the Court does, the Court's also authorized to sanction Morgan Keegan, which I urge it to do. And if the Court has nothing further, I'll conclude my argument with that. Thank you, Your Honors. Thank you. All right. My point, I think, was just made, Your Honor. And I'll say this. He just asked again for this Court to issue a sanction. And that arises out of the arbitration, because we're here in a motion to vacate, an appeal of a motion to vacate proceeding. Why did they not file that with the arbitration panel in Grant 2 instead of coming to this Court, instead of picking and choosing? And, indeed, I want to follow up on Mr. Bennett's point, okay, because you used the word extraordinary. You're right. If you construe that language to be extraordinarily broad, what that tells me is that that is beyond the scope of, again, upon traditional contract principles, of anything that makes sense. It wouldn't make sense to construe it that broadly. And to do so would read the word account right out of the agreement.  That's a great question, Your Honor. It works against the customer. No, Your Honor. No. No, it doesn't. Against the customer. It doesn't work against either side. It does not. And if I just may say. I mean, if you win an arbitration, then the customer comes up with something else, you say, well, any other cause, you know. So you're out. You signed that customer. Both parties signed the agreement. You're right, Your Honor. Yeah, but you drafted the agreement. And you drafted it for the benefit of your client. Okay. Well, I'm out of time, Your Honor. Don't blame the SEC. Well, the SEC, all I'm saying is, the SEC, in response to that point, all I'm saying about the SEC, I'm not casting blame. All I'm saying is that the Supreme Court found persuasive the fact that the SEC has been able to submit supplemental authority. There's been replete, many, many, many examples of that. They made you redraft it. Absolutely, Your Honor. Absolutely. Would the Court like us to submit a supplemental? No, no. I'm just curious. Absolutely, they have, because there have been examples where, and I'll give you one. That was just a stray remark. Okay. Okay. But there have been. There have been those situations. Just to finish my last. I'm glad they're awake and they're doing their job. Yeah. The purpose of mentioning the SEC is that the SEC, according to the Supreme Court, is there to ensure that this is an impartial process, that it is a neutral process, that it is one that is fair for all, and it is not one where we have arbitrators who have made up their minds before one side or the other has put on any evidence. For those reasons, Your Honor, we request that both decisions of the lower courts be overturned. Thank you. All right. Why don't each of you have a nice glass of cold ice water. Cool down. We're going to take a seven-minute break.
judges: Bennett, Pregerson, Fletcher